# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND


DC MASON BUILDERS, INC.      *

         v.                  *           Civil No. RDB-15-0046

BANCROFT CONSTRUCTION CO.      *
and LIBERTY MUTUAL INSURANCE CO.      *


BANCROFT CONSTRUCTION CO.      *

         v.                  *

JLN CONSTRUCTION SERVICES, LLC      *
                                     ********


## MEMORANDUM

This case was originally instituted by DC Mason Builders, Inc. ("DC Mason"), a subcontractor on a school construction project, against the prime contractor, Bancroft Construction Company ("Bancroft"), and its surety, Liberty Mutual Insurance Company ("Liberty Mutual").[1] Bancroft has settled that claim, (ECF No. 52), and as a third-party plaintiff/counter-defendant seeks damages and a declaratory judgment against third-party defendant/counter-plaintiff/cross-plaintiff JLN Construction Services, LLC ("JLN") for contract claims related to that construction project. JLN counter-claims and cross-claims against Bancroft and third-party counter-defendant Liberty Mutual for claims related to the same project. Now pending are JLN's motion for partial summary judgment (ECF No. 73) and Bancroft's and Liberty Mutual's motion for summary judgment (ECF No. 74). The parties have fully briefed the motions, and no oral argument is necessary. *See* Local R. 105.6. For the reasons set forth

---

[1] This matter was reassigned to the undersigned Judge of this Court on May 15, 2018.

below, JLN's motion for partial summary judgment is DENIED. Bancroft's and Liberty Mutual's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, it is granted with respect to JLN's discrimination claim and its claim for any actual damages. It is denied with respect to JLN's claim as to any nominal damages.

## BACKGROUND

This dispute concerns cross-claims arising under a construction subcontract between the prime contractor and the subcontractor. On February 3, 2014, the Queen Anne's County Public School District (the "County" or "Owner") awarded Bancroft a contract for renovations to the Stevensville Middle School (the "Project"). Pursuant to the requirements of the Maryland "Little Miller Act," Md. Code Ann., State Fin. & Proc. § 17-101 *et. seq.*, Bancroft obtained a payment bond on the project from Liberty Mutual, naming Liberty Mutual as a surety on the Project. Bancroft entered into subcontracts with different contractors for the various areas of work, including hiring JLN, a Minority Business Enterprise ("MBE"), for two subcontracts: (1) sitework and (2) masonry work. The masonry work was divided into Phases I and II. (ECF No. 55, & 20). The claims between the parties focus on the masonry work rather than the sitework.

### I. The Contract

Bancroft and JLN formed their contract in March 2014. Three documents are relevant to this contract: (1) a master set of General Conditions ("General Conditions") (ECF No. 74, Ex. 3); (2) a Summary of Work Agreement for sitework (ECF No. 73, Ex. 2); and (3) a Summary of Work Agreement for masonry work (ECF No. 74, Ex. 1). Both Summary of Work Agreements were signed by JLN and counter-signed by Bancroft, and the parties do not dispute these agreements form binding contract documents for the Project. (ECF No. 76, Ex. 1; ECF No. 73, Ex. 2). JLN, however, claims the General Conditions are not part of the parties' binding contract

because Bancroft did not sign this document. (ECF No. 73-1, p. 2). The enforceability of this document is relevant because the document contains an indemnification clause stating,

> To the fullest extent permitted by law, Subcontractor agrees to indemnify, defend and hold harmless Bancroft, its officers, agents, employees, and the Owner from and against any and all liabilities, losses, damages, demands, claims, suits, taxes, costs and expenses including reasonable legal fees and other expenses of litigation for…any penalty or fine incurred by or assessed against Bancroft or its client…or any breach of this agreement arising out of or in connection with the active or passive negligence, errors, omissions, or willful misconduct of Subcontractor, its agents, employees, or Subcontractors, arising out of related to the performance of the work hereunder.

(ECF No. 74, Ex. 3, p. 9, & 13). Bancroft claims JLN breached the Subcontract because JLN failed to indemnify Bancroft pursuant to this clause when Bancroft settled this lawsuit with JLN's subcontractor, DC Mason Builders, Inc. ("DC Mason").

Before signing the General Conditions document, JLN made some amendments and corrections to the version it received from Bancroft. JLN's president, Namdi Iwuoha ("Iwuoha"), initialed each page of the amended General Conditions and signed the amended document on March 3, 2014. (ECF No. 74, Ex. 3). JLN sent the document back to Bancroft, but Bancroft did not sign it. *Id.* JLN now contends Bancroft's failure to sign the amended version of the General Conditions renders this document unenforceable. (ECF No. 73-1, p. 2). Iwuoha, however, testified in deposition that the General Conditions "[were] one of the contract documents that [JLN] signed and were subject to in conducting [its] work." (ECF No. 76, Ex. 3, Iwuoha Tr. 53:12-17). Additionally, in its interrogatory answers, JLN identified the General Conditions as one of the documents "form[ing] the contract between JLN and Bancroft relating to the Project." (ECF No. 76, Ex. 5, Interr. No. 8).

Bancroft's claims arise out of the suit brought against it by DC Mason. JLN contracted with DC Mason for the masonry scope of JLN's work on or about March 28, 2014. (ECF No.

74, Ex. 4).  Under JLN's contract with Bancroft, JLN was responsible for the acts of DC Mason as its subcontractor.  (ECF No. 74, Ex. 3, p. 8, ¶ 15).  Specifically, the contract specifies JLN is "fully responsible for the acts or omissions of its Subcontractor," and all "subcontracted work must be in conformance with the terms and conditions of this Agreement."  *Id.*  Ultimately, JLN terminated its subcontract with DC Mason, and DC Mason filed suit against Bancroft alleging payment bond claims, intentional interference, and discrimination.  JLN did not defend or indemnify Bancroft in this action.

## II. Performance of the Contract

In the early summer of 2014, JLN and DC Mason began the masonry work on the Project.  (ECF No. 74, Ex. 5, Betz Tr., 13:6-8; 33:12-16; ECF No. 74, Ex. 2, Iwuoha Tr. 65:7-18).  After Phase I of the masonry work was complete, Bancroft provided some positive feedback to JLN on its performance.  (ECF No. 78, Ex. 5, p. 4-5).  JLN's and DC Mason's performance, however, was also deficient in numerous ways, including delays, safety violations, and defective work.  (ECF No. 74-1, p. 10; ECF No. 78, Ex. 5, p. 5-7).

### A. Delays

JLN fell behind schedule in its work early on in the project.  While winter weather conditions were the cause of JLN's sitework delays, insufficient manpower and supervision appear to have been the causes of JLN's masonry work delays.  (ECF No. 78, Ex. 14).  JLN's manpower and supervision problems are evidenced by multiple directives from Bancroft to JLN instructing JLN to provide adequate manpower and to provide a fulltime masonry foreman for the work site.

Bancroft repeatedly notified JLN of its insufficient manpower on the Project site.  (ECF No. 74, Ex. 5, Betz Tr. 32:19-22, 33:1-3).  Bancroft issued its first Notice to Comply for

Insufficient Manpower to JLN on June 19, 2014, explaining JLN's current manpower was inadequate because there was only one site and one masonry crew. (ECF No. 74, Ex. 16). Bancroft directed JLN "to provide sufficient manpower to meet schedule and contract." *Id.* On June 26, 2014, Bancroft's Project Manager, Holly Tarr ("Tarr"), issued another directive to JLN regarding this problem, informing JLN its "inability to provide additional manpower is causing delays to numerous tasks." (ECF No. 74, Ex. 17). Tarr informed JLN that failing to increase its manpower would force Bancroft to "examine [its] options to complete [JLN's work] on schedule per the terms of [the] contract." *Id.* On September 25, 2014, Bancroft again communicated to JLN regarding the inadequate manpower problem, stating "We cannot continue to lose time on the schedule due to your mason's lack of performance. As a result, we will take whatever measures necessary to get your work completed as quickly as possible; and you will be responsible for that cost…." (ECF No. 74, Ex. 18).

Bancroft also communicated with JLN about supervision problems, requesting JLN provide a fulltime masonry foreman for the site. Jeff Zimmerman served as JLN's foreman for both the sitework and the masonry work, which was unacceptable to Bancroft. (ECF No. 74, Ex. 5, Betz Tr. 34:18). Bancroft notified JLN multiple times that JLN needed a separate masonry superintendent. *Id.* at 33:4-11. In June 2014, Bancroft directed JLN to provide a full-time masonry foreman immediately, explaining "The sitework that is happening is more than enough to keep [Zimmerman] busy….Piling the masonry oversight on him is far too much for him to handle by his own admission." (ECF No. 74, Ex 19). JLN claimed the masonry superintendent role was performed by Les Cummings, the owner of DC Mason; however, Bancroft informed JLN this arrangement was unacceptable because Bancroft's contract was with JLN, not DC Mason. (ECF No. 74, Ex. 12). Bancroft attributed delays to JLN's failure to have a dedicated

masonry foreman, telling JLN, "[N]ot having a knowledgeable, full-time JLN foreman on site has resulted in huge amounts of wasted time." *Id.*

## B. Defects

JLN's work also suffered from defects, most notably the failure to install factory bullnose corners on walls and the failure to provide timely masonry mock up panels. First, DC Mason, as JLN's masonry subcontractor, improperly installed walls by failing to install factory bullnose corners[2] where required. (ECF No. 74, Ex. 22). Second, JLN failed to complete on time its masonry mockup panels[3] and samples for the Architect's approval. The deadline was pushed back at least once from May 2014 to June 2014 to accommodate JLN, but JLN failed to meet the extended deadline. (ECF No. 74, Exs. 25, 26). In July 2014, Bancroft informed JLN it was "months late in completing [its] masonry mockups," leading the Architect to make "several wasted trips down to the jobsite to review [its] mockup panels and samples only to find that they were incomplete." (ECF No. 74, Ex. 12).

## C. Safety Violations

JLN's and its subcontractor's work were also marred by safety violations. (ECF No. 74, Exs. 6, 7). Occupational Safety and Health Administration ("OSHA") safety regulations governed the Project, and all subcontractors and sub-subcontractors were required to comply with these regulations. (ECF No. 74, Ex. 3, ¶ 2 at 2). Under JLN's contract with Bancroft, Bancroft was entitled to stop JLN's work if JLN or its subcontractor failed to comply with safety regulations. *Id.* JLN admits it had multiple conversations about D.C. Mason's failure to comply with the safety regulations, and it notified DC Mason that continued safety violations would

---

[2] Bullnose corners are rounded corners. (ECF No. 74, Ex. 2, Iwuoha Tr. 163:3-10).
[3] Mockup panels are "prototype[s] of the finished assembly of the wall[s]…to show the assemblies of the masonry wall,…the block, the insulation, the cavity, the weatherproofing, and the finished product…." (ECF No. 74, Ex. 2, Iwuoha Tr. 78:3-17).

force JLN to remove DC Mason from the site. (ECF No. 74, Ex. 5, Betz Tr. 154:9-21, 156:4-16).[4] In fact, the safety violations led to the removal of a DC Mason employee from the jobsite for failing to wear proper safety equipment while cutting concrete masonry units with a power saw. (ECF No. 74, Ex., 8).[5]

## D. JLN's Termination of DC Mason

Bancroft addressed these issues of delays, work defects, and safety violations in a meeting with JLN in October of 2014 before beginning Phase II of the masonry work. (ECF No. 74, Ex. 27). The meeting resulted in a Letter Agreement between Bancroft and JLN stating, among other things, that JLN would remove DC Mason from all interior masonry work because of the deficiencies in DC Mason's performance. (ECF No. 74, Ex. 28). Removing DC Mason from interior work, however, did not solve the problems. On October 15, 2014, Bancroft again notified JLN of problems with DC Mason's work. This email informed JLN that DC Mason performed work deficiently and failed to correct the work properly. (ECF No. 74, Ex. 24). Bancroft also informed JLN that Cummings, "spent the last several mornings on site attempting to stop [Bancroft's] Mason from correcting [DC Mason's] deficiencies and generally being disruptive to other trades and Bancroft." *Id.*

---

[4] After Bancroft reported one safety violation to JLN, JLN emailed DC Mason's owner stating,
From day one…project dust protection and safety have been an issue. You have had direct conversations with me about this and yet nothing changes….The situation continues to escalate and all you want to do is push back rather than requiring your employees to follow simple safety rules put in place for their own protection. I stand by my earlier statements and will not hesitate to take further action if this nonsense does not cease.
(ECF No. 74, Ex. 10).
[5] Other subcontractors involved in the Project were also cited for OSHA safety violations. (ECF No. 74, Ex. 6). Bancroft, however, claims without support that those subcontractors corrected their safety violations while JLN and DC Mason did not. (ECF No. 81, p. 15).

After receiving Bancroft's email, JLN placed DC Mason on immediate suspension. (ECF No. 74, Ex. 30, p. 3). Two weeks later, JLN terminated its contract with DC Mason altogether because JLN had concluded DC Mason, "[had] neither intention nor the ability to follow simple directives, drawings, and specifications," and DC Mason "continued to cause harm and delay [the Project] by the following actions: poor workmanship, lack of ability to man the project…; failure to perform services…; lack of responsiveness…; safety violations." (ECF No. 74, Ex. 31).[6]

### E. Bancroft's Reassignment of JLN's Masonry Work

After the Phase I masonry work was completed, Bancroft reassigned part of JLN's Phase II masonry work to DW Masonry, another masonry company. (ECF No. 78, Ex. 4, Nave Tr. 23:9-14). JLN was notified of the reassignment on October 6, 2014 at the latest. (ECF No. 74, Ex. 27). Bancroft attributes the reassignment decision to the performance deficiencies in JLN's work on Phase I. JLN, however, contends the reassignment was discriminatory. Robert Betz, JLN's Project Manager, testified a Bancroft site superintendent, Scot Adams, used a racial slur during a phone call with JLN and DC Mason in August 2014. (ECF No. 78, Ex. 2, Betz Tr. 80:13-21, 81:1-8). JLN claims the racial slur is evidence of Bancroft's discriminatory motives in reassigning part of JLN's work. Shortly after the alleged slur, DC Mason sent a complaint, in which JLN did not join, to the County and the Governor's Office of Small, Minority, and Women Business Affairs ("GOMA") alleging racial discrimination by Bancroft. Bancroft conducted an internal interview investigation following the complaint. When JLN was interviewed for the investigation, JLN admitted, contrary to what it now alleges regarding

---

[6] In deposition testimony, JLN's corporate designee, Robert Betz ("Betz"), attempted to retract these statements, testifying the termination letter contained deliberate inaccurate statements. (ECF No. 74, Ex. 5, Betz Tr. 170:11-22, 171:1-6).

discrimination, that it had experienced no problems or issues with Bancroft. (ECF No. 74, Ex. 33, p. 6).

### III. Contract Balance

The remaining contract balance is also at issue. JLN counter-claims against Bancroft and Liberty Mutual for $843,749.52 in construction damages, alleging Bancroft has not paid JLN for certain base contract work and ten change orders.

#### A. Base Contract Work

JLN claims Bancroft has not yet paid JLN for all of the work completed on the project. Iwuoha testified through affidavit that JLN "submitted its last billing to Bancroft through Bancroft's Textura system," but "Bancroft refused to approve the billing or generate the final pay application for both the site work and the masonry work." (ECF No. 78, Ex. 3, & 51). JLN, however, failed to submit any evidence establishing how much it is owed under the Subcontract.

#### B. Change Orders

JLN also alleges there are ten outstanding change orders at issue: Sitework Change Orders 1S, 2S, 16, 17, 23 and 24 and Masonry Change Orders 1, 5, 9, and 10. Bancroft's explanations as to why these Change Orders were not paid or were not submitted to the Owner fall into three categories: (1) the change order was for base contract work, (2) the change order was for work that was never performed, and (3) the change order was untimely and/or unsubstantiated.[7]

---

[7] JLN's Subcontract required JLN issue proposals for compensation within 15 days of conducting the work, or if an adjustment to compensation was sought, to submit a written claim with supporting data within thirty days of the event for which the adjustment was claimed. (ECF No. 74, Ex. 3, ¶ 3).

First, Sitework Change Order 2S and Masonry Change Order 9 were rejected because they sought adjustment for work included in the scope of the Subcontract. (ECF No. 74, Ex. 48, p. 2; ECF No. 74, Ex. 49, p. 2). JLN admitted in an email that Change Order 2S was included in JLN's original scope of work, stating "JLN has accepted ownership of [this order], as this is the footprint of the parking lot that we accepted in our scope of work agreement." (ECF No. 74, Ex. 49, p. 2).

Second, Sitework Change Orders 16, 17, 23, and 24 and Masonry Change Orders 1 and 5 were cancelled because the work claimed in these change orders was never performed. (ECF No. 74, Ex. 47, p. 2; ECF No. 74, Ex. 48, p. 2).

Finally, Sitework Change Order 1S and Masonry Change Order 10 were not paid because they were untimely and/or unsubstantiated. JLN first submitted Sitework Change Order 1S on May 12, 2015, but the work allegedly occurred in April of 2014. This change order was untimely as it was submitted more than a year after the alleged work occurred, so the Owner rejected the change order under JLN's Subcontract. (ECF No. 74, Ex. 47, p. 2). Masonry Change Order 10 was not referenced in JLN's counter-claim or JLN's PCO log. Additionally, JLN provides no evidence that this change order was submitted to Bancroft.

**C. Releases**

Bancroft disputes any remaining contract balance, and it also argues releases executed by JLN discharge Bancroft from any claims JLN may have in connection with the Project. In exchange for each periodic progress payment over the course of the Project, JLN executed "Waivers & Releases of Lien Rights" ("Releases"). (ECF No. 74, Ex. 37). Through September 1, 2015, JLN executed 26 Releases in total, which state in pertinent part:

> The undersigned Subcontractor…hereby acknowledges that upon receipt of payment…as satisfaction in full for all labor, services, and material furnished to

> Bancroft, this document shall become effective to release pro tanto any mechanics' liens, stop notices or bond rights the undersigned has in connection with [the Project]….The Subcontractor hereby expressly waives, releases, and discharges Bancroft and the owner of the property from any and all claims for mechanics' liens and rights to any such claim which the Subcontractor has or may have for labor, services, or materials or otherwise in connection with payment for said work or improvements…"

*Id.*

## IV. Procedural History

On January 7, 2015, DC Mason filed suit against Bancroft alleging (1) action on payment bond; (2) violation of 42 U.S.C. § 1981; (3) tortious interference with contractual relationships; and (4) civil conspiracy. (ECF No. 1). DC Mason amended its complaint shortly thereafter, adding an action on payment bond against Liberty Mutual. (ECF No. 9). On August 3, 2015, Bancroft filed a third-party complaint against JLN alleging four causes of action: (1) breach of contract and indemnification; (2) unjust enrichment; (3) quantum meruit; and (4) declaratory judgment. (ECF No. 32). JLN filed a counter-claim and cross-claim against Bancroft and Liberty Mutual in February of 2017 alleging two causes of action: (1) payment bond claim and (2) violation of 42 U.S.C. § 1981. (ECF No. 55).

On December 14, 2016, Bancroft and DC Mason settled their claims, and DC Mason's claims were dismissed. The settlement did not include any findings or admissions of liability on Bancroft's part. On December 14, 2017, JLN filed a motion for partial summary judgment against Bancroft and Liberty Mutual. (ECF No. 73). The next day, Bancroft and Liberty Mutual filed a motion for summary judgment against JLN. (ECF No. 74). Both motions are now pending before this court.

**STANDARD**

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact exists where, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing a motion for summary judgment, the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The non-movant "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23.

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its

own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822 (2003); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

## ANALYSIS

### I.  JLN's Motion for Partial Summary Judgment (ECF No. 73)

JLN seeks summary judgment on Counts I, breach of contract, and IV, declaratory judgment, of Bancroft's third-party complaint.  Bancroft's claims for breach of contract and declaratory judgment both relate to the indemnification clause in the General Conditions of the parties' Subcontract.  Bancroft claims JLN breached the Subcontract because JLN refused to indemnify Bancroft in DC Mason's lawsuit against Bancroft.  Bancroft also requests a judgment declaring JLN is required to indemnify Bancroft against DC Mason's Amended Complaint.  JLN seeks summary judgment on these claims, contending the indemnification clause is unenforceable.  First, JLN argues the General Conditions document is unenforceable because Bancroft did not sign the document. Alternatively, JLN argues the indemnification clause is void as against public policy. This court finds the General Conditions were binding on the parties as part of their Subcontract, and the indemnification clause is enforceable as it does not violate public policy.  Thus, JLN's motion is denied.

#### a.  Binding Contract

First, JLN contends the General Conditions are not binding because Bancroft did not sign the document.  Maryland law ordinarily does not require a signature to form or execute a

contract.[8] *Stern v. Bd. of Regents*, 846 A.2d 996, 1019 (Md. 2004). A signature is useful to demonstrate "mutuality or assent," but the parties can also demonstrate this through their conduct. *Id.* (citations and internal quotation marks omitted). A signature, however, is required where the terms of the contract make a signature a condition precedent to the formation of the contract or where a contract falls within the Maryland statute of frauds. *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-901; *id.*

Under Maryland law, a condition precedent is defined as "a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises." *Chirichella v. Erwin*, 310 A.2d 555, 557 (Md. 1973) (quoting 17 Am. Jur. 2d, Contracts, § 320). Whether a contract contains a condition precedent is a question of construction and is "dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation." *Id.* (citations omitted). Where a contract requires signatures as an express or implied condition precedent, the contract must be signed in order to be enforceable. *See Pradhan v. Maisel*, 338 A.2d 905, 909-910 (Md. App. 1975). In general, however, signatures are not required to create an enforceable contract because "a party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract." *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1095 (Md. 1979). Even where signatures constitute a condition precedent, the parties can waive the condition explicitly or by their conduct. *Hovnanian Land Inv. Grp. v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011). Generally, the question of whether the parties' conduct amounts to waiver should be

---

[8] It is undisputed Maryland law applies to this action because it arises from a project in Maryland. (ECF Nos. 73, 74, 76, 78).

decided by the trier of fact. *Id.* "Occasionally, however, the waiver is so obvious that a ruling can be made as a matter of law. *Id.* at 984.

The Maryland statute of frauds requires certain types of contracts to be in writing and signed by the party to be charged. MD. CODE ANN., CTS. & JUD. PROC. § 5-901. One such type of contract is an agreement that is not to be performed within one year from its making. *Id.* Importantly, contracts falling within the statute of frauds need only be signed by the "party to be charged" in order to enforce the contract against that party. *Id.* "[I]t is sufficient merely to name the other party or give some designation of him which could be recognized without parol proof extraneous to the instrument." *Sinclair v. Webster*, 104 A.2d 561, 564 (Md. 1954).

In the current case, the General Conditions were executed, despite the absence of Bancroft's signature. The parties demonstrated their assent to the contract with their conduct. *See Stern*, 846 A.2d at 1019. Specifically, JLN and Bancroft both performed the contract. JLN performed work, submitted change orders, and submitted releases pursuant to the General Conditions. (ECF No. 74, Exs. 37, 47-49). Bancroft paid JLN on 26 pay applications pursuant to the General Conditions. JLN even admitted in deposition and interrogatories that the General Conditions constituted one of the contract documents. (ECF No. 76, Ex. 3, Iwuoha Tr. 53:12-17; ECF No. 76, Ex. 5, Interr. No. 8). The parties' performance of the contract for more than two years and JLN's admissions evidence the parties' assent to the General Conditions and establish this document was part of the parties' enforceable contract.

Bancroft's failure to sign the document does not destroy the contract's enforceability because signature was not a condition precedent and the statute of frauds was satisfied.[9] First,

---

[9] JLN cites to *Pradhan v. Maisel* to support its claim Bancroft's signature on the General Conditions was a condition precedent to enforcement of the agreement, despite there being no explicit statement of the condition precedent in the Subcontract. (ECF No. 73-1, p. 14). *See*

JLN points to no evidence showing signature was a condition precedent. Neither the language of the document nor the actions of the parties suggest signature was a condition precedent. Instead of offering any evidence of a condition precedent, JLN argues the document it sent back to Bancroft with amendments was a counter-offer requiring Bancroft's signature. Even if signature had been a condition precedent or the General Conditions as amended by JLN had been a counter-offer, the parties waived the requirement of a signature as a matter of law, evidenced by their conduct of performing the contract for two years.

Second, the statute of frauds is satisfied. The individual Summary of Work Agreements for masonry and sitework were signed in March 2014 and provided the final completion date for work performed as September 9, 2015, showing performance of the agreements could not be completed within one year from the date of execution. (ECF No. 73, Ex. 2; ECF No. 74, Ex. 1). The General Conditions were also executed in March 2014 and expressly incorporated the Summary of Work Agreements as governing contract documents. (ECF No. 74, Ex. 3). Thus, it similarly could not be performed within one year from the date of execution, and it therefore falls within Maryland's statute of frauds. Because the document was signed by JLN, the party to be charged, the statute of frauds is satisfied. (ECF No. 74, Ex. 3). Thus, the General Conditions constituted a binding contract between the parties.

### b. Enforceable Provision

JLN alternatively argues the indemnification clause is unenforceable because it violates public policy. Indemnification or exculpatory clauses are generally valid under Maryland law.

---

*Pradhan v. Maisel*, 338 A.2d 905 (Md. App. 1975). *Pradhan* involved a real estate contract where the evidence showed all parties were aware the contract had to be signed by a corporate officer prior to the contract becoming enforceable. *Id.* at 909-911. By contrast, JLN does not offer any such evidence that signature of the contract was a condition precedent in this case. Thus, *Pradhan* is inapplicable here.

*Mass Transit Admin. v. CSX Transp., Inc.*, 708 A.2d 298, 304 (Md. 1998). Three exceptions exist where the public interest does not permit an exculpatory clause in a contract: (1) where a party seeks to excuse its liability for intentional harms or extreme negligence, (2) where the contract is the product of grossly unequal bargaining power, and (3) where "public policy will not permit exculpatory agreements in transactions affecting public interest." *Wolf v. Ford*, 644 A.2d 522, 525-26 (Md. 1994). The third category includes "those transactions…that are so important to the public good that an exculpatory clause would be so patently offensive such that the common sense of the entire community would pronounce it invalid." *Id.* at 526 (citations and internal quotation marks omitted). Determining whether this exception applies requires the court to consider the totality of the circumstances. *Id.* at 527. Maryland courts, however, are hesitant to invalidate an indemnification or exculpatory clause on public policy grounds, so the standard for finding a clause violates public policy is strict. *See id.* at 526.

Where an indemnification clause is enforceable, the principles of an insurance company's duty to defend and indemnify its insured are informative in determining the subcontractor's duty to defend and indemnify the general contractor. In the context of insurance contracts, Maryland law holds the duty of an insurance company to defend its insured can be broader than its duty to indemnify its insured. *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 677 (Md. 2015). The duty to defend applies to all claims that are *potentially* covered under the insurance policy. *Id.* at 682. If the allegations of the underlying complaint leave any uncertainty as to the potentiality of coverage, "any doubt must be resolved in favor of the insured." *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 864 (Md. 1995). These principles are equally applicable in the context of an indemnitor's duty to defend under an indemnity clause.

This court finds it is not clear as a matter of law that JLN had no duty to defend or indemnify Bancroft in the DC Mason lawsuit. JLN contends Bancroft cannot seek defense or indemnity from JLN because Bancroft was accused of intentional torts, claiming these fall within the intentional act exception to enforceability, and discrimination, claiming this falls within the public policy exception. DC Mason, however, also alleged quasi-contractual claims against Bancroft and Liberty Mutual on the payment bond. (ECF No. 1). Neither party disputes that these quasi-contractual claims are at least potentially covered by the indemnification clause, therefore triggering JLN's duty to defend Bancroft in the suit. JLN also overlooks that Bancroft settled its case with DC Mason without any findings or admissions of liability as to any of the allegations in DC Mason's complaint. Accordingly, even if JLN is correct that the indemnification clause is void as against public policy as applied to DC Mason's intentional tort and discrimination claims, it is still not clear JLN is entitled to judgment as a matter of law. Thus, JLN's motion for partial summary judgment is denied.

## II. Bancroft's and Liberty Mutual's Motion for Summary Judgment (ECF No. 74)

Bancroft and Liberty Mutual seek summary judgment on JLN's counter-claim and cross-claim, specifically on JLN's payment bond claim and discrimination claim. First, JLN brings a payment bond claim against Bancroft and Liberty Mutual, alleging Bancroft has failed to pay JLN for change orders and work performed under the Subcontract. Bancroft and Liberty Mutual claim no money is due to JLN. Second, JLN brings a 42 U.S.C. § 1981 claim against Bancroft, alleging Bancroft took adverse employment actions against JLN for discriminatory reasons. Bancroft contends there was no discrimination. For the following reasons, Bancroft's and Liberty Mutual's motion is granted in part and denied in part.

### a. Payment Bond Claim

Bancroft and Liberty Mutual seek summary judgment on JLN's payment bond claim, contending JLN released part of this claim and failed to support the remaining amount of the claim with evidence. While JLN does not dispute the validity or enforceability of the Releases, JLN argues its bond claim is not barred as to work performed after the date of the last executed release. (ECF No. 78-1, p. 30-31). This court finds the Releases bar JLN's bond claim for work incurred prior to the date of the last Release. As to work incurred after the date of the last Release, JLN has failed to satisfy its burden of showing actual damages. Thus, summary judgment is granted in part as to JLN's payment bond claim.

### 1. Releases

Maryland's "Little Miller Act" requires a contractor on a public project to post performance and payment bonds for any state contract exceeding $100,000. MD. STATE FIN. & PROC. CODE § 17-103. The purpose of the Little Miller Act is "to provide greater protection to sub-contractors on contracts awarded by the State." *Atlantic Sea-Con Ltd. v. Robert Dann Co.*, 582 A.2d 981, 984 (Md. 1990) (quoting Legislative Council of Maryland, Report to the General Assembly of 1959, at 17 (1959)). In light of this purpose, courts liberally construe the Little Miller Act to protect subcontractors. *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 118 (4th Cir. 2004). For guidance in interpreting the Little Miller Act, Maryland courts look to federal decisions construing the federal Miller Act. *Gen. Fed. Constr., Inc. v. D.R. Thomas, Inc.*, 451 A.2d 1250, 1255 (Md. App. 1982). Maryland courts may, however, refuse to follow federal decisions "where the court believes the purpose of the State statute differs." *Id.*

"The liability of a surety is coextensive with that of the principal,' and thus, 'the liability of the surety is measured by the contract of the principal.'" *Sheet Metal Workers' Local Union*

*No. 100 D.C. Area Pension Fund v. W. Sur. Co.*, 187 F. Supp. 3d 569, 577-78 (D. Md. 2016)

(quoting *Gen. Builders Supply Co. v. MacArthur*, 179 A.2d 868, 871-72 (Md. 1962)).  Consistent

with this principle of Maryland surety law and interpretation of the Miller Act, the surety on a

Little Miller Act payment bond is liable "only to the extent that the general contractor would be

liable—and the surety may avail itself of most contract defenses, including the doctrines of

release and waiver."  *See United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824,

832 (D. Md. 2016).

　　　　Under Maryland law, releases are contracts and are construed and applied according to

contract law.  *Owens-Illinois, Inc. v. Cook*, 872 A.2d 969, 985 (Md. 2005).  Maryland courts

apply the objective theory of contract interpretation where "the written language embodying the

terms of an agreement will govern the rights and liabilities of the parties, irrespective of the

intent of the parties at the time they entered into the contract."  *Md. Cas. Co. v. Blackstone Int'l*

*Ltd.*, 114 A.3d 676, 681 (Md. 2015) (quoting *Long v. State*, 807 A.2d 1, 8 (Md. 2002)).  If the

terms of a contract are clear and unambiguous, then the court construes the contract according to

its plain meaning.  *Id.* at 695.  If the terms are ambiguous, the court may consider extrinsic

evidence concerning the parties' intent because "it is well settled that a release is to be construed

according to the intent of the parties and the object and purpose of the instrument, and that intent

will control and limit its operation."  *Hartford Accident & Indem. Co.*, 168 F. Supp. 3d at 832-33

(quoting *Shriver v. Carlin & Fulton Co.*, 141 A. 434, 440 (Md. 1928)).

　　　　The Releases unambiguously release Bancroft from any claims JLN may have in

connection with the Project through the date of each specific Release.  (ECF No. 74, Ex. 37).

*See Signal Perfection, Ltd. v. McPhee Elec., Ltd.*, No. WGC-10-2311, 2015 WL 84678, at *17

(D. Md. January 6, 2015) (finding similar releases barred a subcontractor's claims for unpaid

scope of work and change orders).  JLN even admits "[Bancroft] is released up to a specific date stated in the executed partial release and waiver."  (ECF No. 78-1, p. 30).  JLN signed its last Release on September 1, 2015.  (ECF No. 74, Ex. 37, p. 26).  Each of the ten change orders alleged in this case are dated prior to September 1, 2015.  (ECF No. 78, Ex. 26).  Thus, JLN released the ten change orders it now claims.  Accordingly, summary judgment is granted in favor of Bancroft and Liberty Mutual in the amount of the ten alleged change orders and the unpaid scope of work incurred prior to the date of the last Release.

### 2. Damages

Under Maryland law, "the plaintiff has the burden of proving the fact of and extent of the damages he has sustained.  Those damages must be proved with reasonable certainty, and may not be based on speculation or conjecture."  *Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 752 (D. Md. 1982).  To recover more than nominal damages, the plaintiff must show some proof of the amount of the damage.  *Della Rata, Inc. v. Am. Better Cmty. Developers, Inc.*, 380 A.2d 627, 641 (Md. App. 1977).  "[F]acts must exist and be shown by the evidence which afford a reasonable basis for measuring the plaintiff's loss.  The damages must be susceptible of ascertainment…by reference to some fairly definite standard…."  *Id.* (quoting 22 Am. Jur. 2d Damages, § 25).  Where a plaintiff fails to produce evidence of damages, summary judgment as to actual damages is appropriate, but the plaintiff may still proceed to trial to recover nominal damages.  *See Nguti v. Safeco Ins. Co.*, Case No. PX-15-742, 2017 WL 2778821, at *3-4 (D. Md. June 27, 2017).

JLN claims it is owed unpaid scope of work damages incurred after the date of the last Release, but it does not specify the amount of damages or offer any evidence supporting its claim for damages.  The only evidence JLN has put forth is a declaration by Iwuoha in which he states,

> JLN submitted its last billing to Bancroft through Bancroft's Textura System.
> Bancroft refused to approve the billing or generate the final pay application for

> both the site work and the masonry work. Bancroft disabled JLN access to
> Textura after the last time that JLN entered its information for final pay.

(ECF No. 78, Ex. 3, Iwuoha Decl && 51-52). Betz also testified he "[thought]" there had been a

pay application submitted to JLN that was rejected, but he could not testify as to the pay

application number or as to the amount due on that pay application. (ECF No. 78, Ex. 2, Betz

Tr. 198-199). These statements offer no foundation which would allow the fact finder "to make

a fair and reasonable estimate of the amount of the damage." *See Della Ratta, Inc.*, 380 A.2d at

641. JLN offers no reference to any standard by which damages could be determined. *See id.*

Instead, JLN merely speculates it is owed some indefinite amount of damages for unspecified

unpaid scope of work. Because JLN failed to satisfy its burden of "proving the fact of and extent

of [its] damages," Bancroft's and Liberty Mutual's motion for summary judgment is granted as

to any actual damages sought by JLN. *See Kirby*, 554 F. Supp. at 752. However, it is denied

with respect to nominal damages and JLN may still proceed to trial seeking to recover nominal

damages.

### b. 42 U.S.C. § 1981 Claim

Bancroft and Liberty Mutual also seek summary judgment on JLN's discrimination

claim, contending its actions toward JLN were not motivated by discrimination. This court finds

JLN fails to meet its burden of proving unlawful discrimination. Thus, summary judgment is

granted as to this claim.

The purpose of 42 U.S.C. § 1981 is "to proscribe discrimination in the making or

enforcement of contracts, against, or in favor of, any race." *Gratz v. Bollinger*, 539 U.S. 244,

276 n. 23 (2003) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-96

(1976)). A plaintiff may prove unlawful discrimination under § 1981 in one of two ways: (1)

direct or circumstantial evidence of discrimination or (2) a burden-shifting framework. *Ngala v. Chevy Chase Bank*, 945 F. Supp. 869, 872 (D. Md. 1996).[10]

First, the plaintiff may introduce direct or circumstantial evidence "that [its] race was a motivating factor in the employer's adverse employment action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). The evidence must "clearly indicat[e] a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Such evidence may consist of "incriminating statements" or "a general pattern of discrimination in [d]efendant's employment practices." *Ngala*, 945 F. Supp. at 872 (citations omitted). Derogatory remarks may constitute direct evidence of discrimination if the remarks were related to the employment decision in question. *Brinkley*, 180 F.3d at 608 ("Title VII was not designed to create a federal remedy for all offensive language…in the workplace.") (citations omitted).

Alternatively, the plaintiff may rely on the *McDonnell Douglas Corp. v. Green* burden-shifting framework. 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination by showing, by a preponderance of the evidence, that (1) it is a member of a protected class, (2) its job performance was satisfactory, (3) it was subjected to an adverse employment action, and (4) similarly situated employees outside of its class received more favorable treatment. *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Holland*, 487 F.3d at 214.

---

[10] The same standards of review apply in both Title VII and § 1981 cases. *Ngala*, 945 F. Supp. at 872.

If the defendant carries this burden, then the plaintiff must prove, by a preponderance of the evidence, both that the defendant's proffered reason was not the true reason for the employment decision and that the proffered reason was a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff can show pretext by "provid[ing] evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning…manufactured after the fact." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 649, n. 4 (4th Cir. 2002) (citing *Burdine,* 450 U.S. at 255). Such evidence does not necessarily establish intentional discrimination, but it can permit an inference of such discrimination when combined with the elements of the prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). The plaintiff's mere speculations, however, "are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Langerman v. Thompson*, 155 F. Supp. 2d 490, 499 (D. Md. 2001) (citations omitted).

### 1. No Direct Evidence of Discrimination

JLN's discrimination claim fails under both approaches. First, JLN has failed to meet its burden in showing discrimination through direct evidence. As direct evidence of discrimination, JLN alleges Scot Adams used racial slurs during a phone call in August of 2014. (ECF No. 78-1, p. 16). Betz testified Adams "scream[ed] at [Betz] to get [Sean Danielson] off the site" and "used a racial term for black people, and then he used a racial term for Hispanic people." (ECF No. 78, Ex. 2, Betz Tr. 80:13-21, 81:1-8).

Although Betz's testimony provides evidence of derogatory remarks on the part of a Bancroft superintendent, JLN fails to produce evidence connecting these remarks to the adverse employment action of reassigning part of JLN's masonry work. Bancroft's Vice President of Operations, Bart Nave ("Nave"), stated in an affidavit, "Mr. Adams had no authority or influence regarding any contract decisions made by Bancroft management regarding JLN's subcontract." (ECF No. 74, Ex. 43, Declaration of Bart Nave, & 7). In fact, Nave explained, Bancroft superintendents do not have authority to make employment decisions such as the one made in this case; only Bancroft's three senior officers and majority shareholders have the authority to terminate a subcontract or to limit the scope of work to be performed under a subcontract. (ECF No. 74, Ex. 43, Declaration of Bart Nave, & 6-7). JLN offers no evidence to dispute this testimony. Adams' derogatory remarks during the August 2014 phone call appear to be "stray" or "isolated," and there was no nexus between the remarks and the reassignment of JLN's work. *See Brinkley*, 180 F.3d at 608. Thus, JLN has failed to support its § 1981 claim with direct evidence.

## 2. Burden Shifting Framework

Second, JLN fails to support its discrimination claim under the burden-shifting framework. Even assuming that JLN has established a prima facie case of discrimination,[11] JLN fails to show Bancroft's legitimate reasons for its adverse employment actions are a pretext for

---

[11] It is undisputed JLN satisfies the first element of the prima facie case: JLN is a member of a protected class as a minority owned business (MBE), solely owned by Namdi Iwuoha, who is African American. Whether JLN satisfies the second element is less clear. Although JLN alleges its job performance was satisfactory, Bancroft's reason for reassigning JLN's work is that JLN's performance was deficient. The evidence suggests JLN's performance was in fact unsatisfactory. *See infra* Section b.2.i. The parties also disagree on whether JLN satisfies the third and fourth elements of the prima facie case. Even if JLN could, however, establish the prima facie case, JLN would still fail to show discrimination under the burden-shifting framework.

discrimination. JLN alleges Bancroft subjected it to two adverse employment actions: (1) giving part of JLN's scope of work to another masonry and (2) failing to submit some of JLN's proposed change orders to the Owner. (ECF No. 78-1, p. 20).

### i. Reassignment of JLN's Scope of Work

Bancroft has met its burden in putting forth valid, nondiscriminatory reasons for its reassignment of JLN's work. Bancroft alleges it reassigned part of JLN's work because JLN's performance on Phase I of the masonry work was deficient and untimely. Bancroft notified JLN repeatedly of JLN's insufficient manpower on the Project site, which was leading to delays. (*See e.g.* ECF No. 74, Ex. 16). JLN was also requested to provide a fulltime masonry foreman for the site multiple times, but failed to do so. (*See e.g.* ECF No. 74, Ex. 5, Betz Tr. 33:4-11). Additionally, there were defects in JLN's assigned work. JLN's subcontractor, DC Mason, improperly installed the walls by failing to install the correct type of corner, and JLN failed to timely complete its masonry mockup panels and samples. (ECF No. 74, Exs. 22, 25, 26). Finally, safety violations were a significant problem with JLN and its subcontractor. (ECF No. 74, Ex. 5, Betz Tr. 154:9-21, 156:4-16). Bancroft corresponded with JLN regarding these issues throughout the Project. The problems ultimately led Bancroft to reassign part of JLN's scope of masonry work to DW Masonry.

JLN has failed to show Bancroft's reason for reassigning its work was a pretext for discrimination. JLN first attempts to show pretext by arguing its work was not defective, relying in part on an email in which Bancroft gave JLN positive feedback at the conclusion of Phase I. (ECF No. 78, Ex. 5). That email, however, also contained a section composed entirely of negative feedback, so it provides no evidence that Bancroft's reason was pretextual. *Id.* Next, JLN cites to numerous pieces of correspondence in which JLN "responded to Bancroft's constant

false allegations of deficiencies, false allegations of lack of manpower, and other false statements to hide Bancroft's true intention of discrimination against JLN…." (ECF No. 78-1, p. 26-27). All but one of these emails, however, are dated after Bancroft reassigned JLN's work and thus show no support for JLN's claim of pretext. (ECF No. 78, Exs. 9, 11, 12, 14-18).

One email is dated September 30, 2014, prior to the date JLN learned of the reassignment of its work. Bancroft emailed JLN about "numerous quality issues regarding the CMU walls" and asked JLN to correct the deficiencies in its work. (ECF No. 78, Ex. 10). JLN responded, requesting a letter from the architect and stating Bancroft had failed to point out the deficiencies in an earlier walk through. *Id.* JLN, however, also stated, "We will work the areas tomorrow and as each is completed I will require a member of your team to sign off on their completion." *Id.* Thus, JLN did not dispute there were deficiencies requiring correction; in fact, JLN stated in the email it would correct the deficiencies the following day.

Second, JLN attempts to show pretext by alleging its delays were weather related and therefore outside of its control. The weather conditions, however, were only responsible for delays in JLN's sitework, and the relevant delays to the reassignment were those in JLN's masonry work. (ECF No. 78, Ex. 14). Third, JLN argues its safety violations could not have contributed to the reassignment of its work because other subcontractors were also cited for safety violations. (ECF No. 74, Ex. 6). JLN, however, puts forth no evidence suggesting the other subcontractors were not reprimanded in some way for their own safety violations. JLN also admitted it had notified DC Mason that continued safety violations would force JLN to remove DC Mason from the site, showing JLN knew the safety violations were a significant problem. (ECF No. 74, Ex. 5, Betz Tr. 154:9-21, 156:4-16).

Although JLN now alleges discrimination by Bancroft, JLN did not join in DC Mason's discrimination complaint against Bancroft. Additionally, when JLN was interviewed in connection with Bancroft's internal investigation, JLN stated it had experienced no problems or issues with Bancroft. (ECF No. 74, Ex. 33, p. 6). In sum, JLN offers no evidence Bancroft's reasons are not the true reasons for its decision. JLN thus fails to carry its burden of showing Bancroft's reasons are a pretext for discrimination.

### ii. Failing to Submit Proposed Change Orders to Owner

In addition to the reassignment of JLN's work, JLN claims Bancroft's failure to submit some of its proposed change orders to the Owner represents discrimination. Bancroft again fulfills its burden in putting forth a legitimate, nondiscriminatory reason for its action: the change orders at issue were not submitted to the Owner because they were unsatisfactory. Two change orders were rejected because they sought adjustment for base contract work. (ECF No. 74, Ex. 48, p. 2; ECF No. 74, Ex. 49, p. 2). Six change orders were cancelled because the work claimed was never performed. (ECF No. 74, Ex. 47, p. 2; ECF No. 74, Ex. 48, p. 2). One change order was not paid because it was untimely; it was submitted more than a year after the alleged work occurred, which was outside the required timeframe for submission under the Subcontract. (ECF No. 74, Ex. 47, p. 2). Finally, Bancroft claims one change order was not paid because it was never submitted to Bancroft. This change order was not referenced in JLN's counter-claim or JLN's PCO log, and JLN provides no evidence the change order was submitted to Bancroft.

JLN fails to show Bancroft's reasons for rejecting the change orders at issue are pretext for discrimination. JLN attempts to show pretext by comparing its unpaid change orders to approved DW Masonry change orders, arguing the change orders submitted by JLN and DW Masonry were similar. According to JLN, the similarities between the two subcontractors'

change orders shows Bancroft's true reason for rejecting JLN's change orders while approving DW Masonry's change orders was discrimination.

The evidence, however, shows DW Masonry's change order requests included daily tickets demonstrating the work performed each day, lists of the costs incurred including labor hours expended, and signatures by a Bancroft field superintendent certifying the work was authorized and complete. (ECF No. 78, Ex. 27). By contrast, JLN's rejected change orders did not include daily tickets, lists of labor hours expended, or signatures by a Bancroft field superintendent. (ECF No. 78, Ex. 26). The evidence shows disparities between JLN's and DW Masonry's change orders that account for their differential treatment by Bancroft. JLN has therefore not shown by a preponderance of the evidence that Bancroft's reasons for rejecting its change orders are a pretext for discrimination. Thus, summary judgment is granted in favor of Bancroft as to JLN's § 1981 claim.

## CONCLUSION

For the aforementioned reasons, JLN Construction Services, LLC's motion for partial summary judgment (ECF No. 73) is DENIED. Bancroft Construction Company's and Liberty Mutual Insurance Company's motion for summary judgment (ECF No. 74) is GRANTED IN PART and DENIED IN PART. Specifically, it is granted with respect to JLN's discrimination claim and its claim for any actual damages, but it is denied with respect to JLN's claim as to any nominal damages. Accordingly, as to Count I, partial summary judgment is granted as to the claim for actual damages, but not nominal damages. Summary judgment is granted as to Count II.

A separate order follows.

November 27, 2018                              /s/
Date                                           Richard D. Bennett
                                               United States District Judge